UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALGONQUIN GAS TRANSMISSION, LLC, )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>APPROXIMATELY 161,949 CUBIC FEET and )<br>APPROXIMATELY 8,248 LINEAR FEET OF )<br>PERMANENT EASEMENT AREA, and )<br>APPROXIMATELY 482,291 SQUARE FEET OF )<br>TEMPORARY EASEMENT AREA IN THE CITY )<br>OF BOSTON, MASSACHUSETTS, THE BOSTON )<br>PUBLIC IMPROVEMENT COMMISSION, and )<br>THE CITY OF BOSTON, MASSACHUSETTS, )<br>)<br>*Defendants.* ) | No. 15-CV-12870-WGY |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

The City of Boston (the "City") and the Boston Public Improvement Commission ("PIC" or the "Commission") sought to work cooperatively with the plaintiff, Algonquin Gas Transmission, LLC ("Algonquin"), with respect to its desire to obtain a "grant of location" license from PIC for the installation of gas transmission lines under public ways in the West Roxbury neighborhood of the City.

Such a grant of location would provide Algonquin with the right-of-way it desires along the route approved by the Federal Energy Regulatory Commission ("FERC"). In the middle of grant of location process, however, Algonquin commenced this action under Section 7(h) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), seeking an order of taking granting it permanent and temporary easements over and under more than a mile and a half of city streets in West Roxbury.

747298.2

With its original complaint, Algonquin filed and served its Motion For Partial Summary Judgment. That motion should be denied for three reasons.

First, Algonquin has not shown that the easements it seeks are necessary to comply with FERC's Certificate of Public Convenience And Necessity ("Certificate"). In fact, they are not necessary.

Second, Algonquin did not negotiate in good faith to reach an agreement as to the easements and the compensation to be paid for such easements. That is a condition precedent to its § 717f(h) action, which it did not satisfy. Alternatively, there is a genuine dispute of material fact as to whether it did.

Third, the grant of location process offered by PIC is not subject to federal pre-emption by the NGA, is not inconsistent, or in conflict, with either the NGA or the Certificate, and provides the path to the right-of-way Algonquin desires. Therefore, Algonquin is required to avail itself to that process.

## FACTS

### *PIC and its Authority to Issue Grants of Location*

PIC is an independent body located in the Boston Public Works Department and staffed by Public Works Department personnel (the "PIC Staff"). *Affidavit Of Chong Liu Esq. In Opposition To the Motion For Partial Summary Judgment ("Liu Aff.")*, ¶ 2. The members of the PIC Commission are the Commissioner of the Public Works Department, the Commissioner of Property Management, the Commissioner of the Inspectional Services Department, the Commissioner of the Transportation Department, and the Executive Director of the Boston Water and Sewer Commission ("BWSC"). *Id.* The Commissioner of the Public Works Department also acts as Chairman of PIC. *Id.*

2

PIC has the authority to lay out, widen, relocate, alter, and discontinue public ways, order the construction of sanitary sewers and storm drains, and levy assessments for betterments. *Liu Aff.*, ¶ 4. It also has the sole authority to approve and issue what are referred to as a "grant of location" for subsurface improvements or alterations under public ways, including wires, conduits and pipes. *Id.* As Algonquin acknowledges, "PIC must authorize the issuance of a permit for the purpose of laying pipes under the public streets of Boston." *Affidavit Of James M. Behnke In Support of Motion For Partial Summary Judgment ("Behnke Aff.")*, ¶ 7.

A grant of location is a license, not an easement. *Liu Aff.*, ¶ 5. Neither PIC nor the City grants easements for wires, conduits or pipes below the surface of a public way. *Id.* A grant of location license from PIC is the exclusive way for a private party to obtain a right-of-way under a public way in Boston. *Id.*; *Behnke Aff.*, ¶ 7.

### *The PIC Process*

The process for obtaining a grant of location license from PIC for a right-of-way under a public way in Boston (the "PIC Process") is well known and followed by numerous private parties every year, year after year. *Liu Aff.*, ¶ 6. It involves several steps that culminate, if successful, with the approval by the Commission of the grant of location and the issuance of the necessary permits to perform the subsurface construction and installations under the public way, or ways, at issue. *Id.*, ¶ 7.

The City and PIC have goals and interest that they seek to further in the PIC Process, including: (1) allowing the several relevant public agencies that participate, to contribute their expertise to a coordinated, and therefore efficient, coherent and safe, opening of a public way and construction project; (2) ensuring that other parties already

3

holding grants of locations for utilities under the public way are involved and their interests considered and protected; and (3) conducting the approval process in public and permitting public comment. *Id.*, ¶ 8. In a case such as the three West Roxbury streets at issue here, these considerations are of paramount importance. *Affidavit Of John P. Sullivan, PE, In Opposition To the Motion For Partial Summary Judgment* ("*Sullivan Aff.*"), ¶¶ 3-10. Under those three streets are BWSC water, sewer and storm facilities as well as electric, gas, telephone and traffic signal conduit and pipes. *Id.*, ¶¶ 3 and 6-8. Accordingly, coordination is essential to avoid serious and irreparable damage to existing facilities and abutting property owners. *Id.*, ¶ 10.

Generally speaking, the PIC Process begins with the private party (the "Applicant") submitting plans prepared, stamped and signed by its engineers to the relevant public agencies. *Liu Aff.*, ¶ 9. Those departments and the engineers for the Applicant would then have discussions and exchange information. *Id.*

Early in the process, the Applicant is required to send, via certified mail, its plans to a list of private utilities. *Id.*, ¶ 10. This step is intended to engage those others private utilities that may be impacted by the proposed subsurface installation. *Id.*

After those steps, the Applicant begins drafting the necessary legal documents, *e.g.*, a License, Maintenance and Indemnification Agreement ("LMI"). *Id.*, ¶ 11. That document is completed at the *end* of the PIC Process and certainly after the Applicant has filed its submission, or application, for the grant of location and gone through the required public hearings. *Id.*

An indispensable step in the PIC Process is the filing of the Applicant's submission requesting the grant of location with all of its supporting materials (the

747298.2

"Submission"). *Id.*, ¶ 12. Without a Submission, PIC will not issue a grant of location. *Id.* Algonquin never submitted one. *Id.*, ¶ 18.

After a Submission is filed and following further discussions with, and feedback from, the PIC Staff and the relevant public agencies, the Applicant and its Submission go through the public hearing portion of the PIC Process. *Id.*, ¶ 13. The public hearings are advertised and allow for inquiries from members of the Commission, different city agencies and departments, and members of the public. *Id.* ¶ 15. These may result in revisions to the Submission as well as subsequent public hearings. *Id.*

At the conclusion of the PIC Process, the Commission may approve or deny the Submission followed by the issuance of the Commission Order. *Id.*, ¶ 16. Attached as Exhibit A to the *Liu Affidavit* is an example of such a Commission Order.

Generally speaking, the legal agreements associated with an approved grant of location, *e.g.*, a LMI, are finalized around that time that the Commission approves a Submission, because it simply memorializes the Commission-approved grant of location and associated terms and conditions. *Id.*, ¶ 17.

### *Algonquin Starts the Pic Process*

Algonquin started but never completed the PIC Process. *Id.*, ¶ 18; *Sullivan Aff.*, 9. Among other thing it never filed a Submission. *Liu Aff.*, ¶ 18. There is nothing preventing it from continuing the PIC Process that it started but has yet to finish. *Id.*

On November 7, 2014, Algonquin's engineer, Howard Moshier, and its attorney, James Behnke, met with PIC's counsel, Chong Liu. *Id.*, ¶¶ 1 and 20. During that meeting, Algonquin's representatives indicated that Algonquin would seek PIC's approval of a grant of location license to install a natural gas pipeline under certain streets

of West Roxbury. *Id.* Liu explained the PIC Process to them, and asked them to show him some engineering plans. *Id.* Moshier showed Liu several sheets of engineering plans, but Liu was not permitted to retain any copies. *Id.*, ¶¶ 20-21.

They asked Liu to work out some type of agreement "in principle" for its license to build-out out the subsurface pipeline. *Id.*, ¶ 21. Liu explained that such agreement, such as a LMI, simply memorialized whatever the Commission ultimately approves following the PIC Process, not the other way around. *Id.* Liu recommend that they contact the PIC Staff and start the PIC Process. *Id.*

These discussions between Liu and Behnke resumed in January and continued into the Spring of 2015. *Liu Aff.*, ¶¶ 22-28; *Behnke Aff.*, ¶¶ 9-19. Behnke continued to pursue the PIC Process and affirm Algonquin's interest in it. *Behnke Aff.*, Ex. C and K; *Liu Aff.*, 19-25. Liu continued to request copies of Algonquin's plans and Algonquin's representatives continued to refuse to provide them to him. *Liu Aff.*, ¶¶ 22-25 and 28. There is nothing in their communications that suggests that Liu was uncooperative or non-responsive, and Algonquin does not claim that he was. *Behnke Aff.*, ¶¶ 8-19.

### *Algonquin Abandons the PIC Process*

On June 3, 2015, Liu received an email from Behnke regarding the status of Algonquin's project. *Liu Aff.*, ¶ 29. At that time, Algonquin and BWSC were working together to determine that location of several important BWSC locations along the pipeline route in West Roxbury. *Behnke Aff.*, Ex. L.

On June 9, 2015, Liu asked Behnke via email whether Algonquin had filed its Submission with the PIC. *Liu Aff.*, ¶ 29, *Behnke Aff.*, Ex. M. A week later, on June 16, 2015, Behnke replied that Algonquin had not filed its Submission with PIC yet. *Liu Aff.*,

747298.2

¶ 29; *Behnke Aff.*, Ex. N. The purported reasons Behnke gave for Algonquin's failure to file made no sense to Liu. *Liu Aff.*, ¶ 29.

### *Algonquin's Bad Faith "Offer"*

On June 23, 2015, Algonquin sent a letter (the "Gessner Letter"), to Commissioner Michael D. Dennehy, Boston Public Works Department, which proposed for the first time that PIC sell Algonquin permanent and temporary easements. *Affidavit Of Franklin S. Gessner In Support Of Plaintiff's Motion For Partial Summary Judgment ("Gessner Aff.")*, Ex. E. The Gessner Letter was very misinformed about the PIC Process. *Liu Aff.*, ¶ 30.

Moreover, the proposed easements that Algonquin proposed to buy were not adequately described. Attached to the Gessner Letter is a proposed Grant Of Easement and plans titled LD-P-8183 through LD-P-8199 (the "Easement Plans"), which are incorporated into the proposed Grant Of Easement. *Gessner Aff.*, Ex. E.

The Easement Plans were too inadequate and incomplete for PIC to consider or evaluate. *Affidavit Of Todd M. Liming, PE, In Opposition To The Motion For Partial Summary Judgment ("Liming Aff.")*, ¶¶ 4-11. Among other things, while the Gessner Letter states that the pipeline will be approximately 3-5 feet below the surface; this is not stated in either the Grant Of Easement or the Easement Plans. *Id.* ¶ 6. Furthermore, it is entirely unclear what the 3-5 foot mark is considered to. *Id.* Elevations/depths of the proposed pipe are not shown on the Easement Plans. *Id.* Similarly, horizontal/lateral dimensions are not shown on the Easement Plans. *Id.*, ¶ 7.

None of the numerous preexisting utilities are shown on the Easement Plans. *Id.*, ¶ 8; *see also Sullivan Aff.*, ¶¶ 3 and 6-8. Furthermore, the Gessner Letter unhelpfully

7

failed to include engineering reports, to indicate whether the other right-holders within its proposed easement areas, both temporary and permanents, were located. *Gessner Aff.*, Ex. E; *Liu Aff.*, ¶ 31. Such rights, including the utilities rights, such as water, sewer, gas and electricity, may be permanently affected by Algonquin's acquisition of the permanent easement rights. *Liu Aff.*, ¶ 31. The PIC Process would ferret out all of those issues and considerations and ensure a coordinated and safe installation. *Id.*

Lastly, the Easement Plans do not adequately show where the temporary easement/work space is proposed to be located. *Liming Aff.*, ¶ 11. Given these numerous deficiencies, it is not surprising that there is no shown registered professional engineer (PE) of record reflected on the Easement Plans. *Id.*, ¶ 6.

On July 1, 2015, Commissioner Dennehy sent a letter to Gessner encouraging Algonquin to complete the PIC Process. *Liu Aff.*, ¶ 32 and Ex. B. That same day, Algonquin commenced this suit and moved for partial summary judgment.

On July 6, 2015, it filed its Amended Condemnation Complaint ("Amended Complaint").

## ARGUMENT

1. **Algonquin has not established that the easements over and under the West Roxbury Streets are necessary to comply with the Certificate.**

Algonquin asserts that it must satisfy three conditions to make out its prima facie case under Section 7(h) of the NGA, 15 U.S.C. § 717f(h). *Pl. Memo*, pp. 7 and 8. The second of the three conditions, which Algonquin concedes it must prove, is that the easements over and under the West Roxbury Streets are necessary to comply with the Certificate issued by FERC. *Id.*

It is apparent, however, that the easements are not necessary. As the Behnke Affidavit explains, PIC has a well established process for "the issuance of a permit for the purpose of laying pipes under the public streets of Boston." *Id.*, ¶ 7. Through this process, a party such as Algonquin "can obtain a Grant of Location for access to and use of the Boston streets for their facilities." *Id.*

By their unambiguous words and actions, Algonquin acknowledged that a grant of location from PIC would provide Algonquin with the necessary right-of-way to install its pipeline along the route it selected and which was subsequently approved by FERC. *See Behnke Aff.*, ¶¶ 7-12, 15, and 18 and Exs. C and K; *see also Liu Aff.*, ¶¶ 19-25. For example, in his January 9, 2015 email to Liu, Behnke stated that "Algonquin currently expects to apply to the Commission to be heard at a public hearing on review and approval of the LMIs and Plans in February of 2015." *Behnke Aff.*, Ex. C.

Even after FERC issued the Certificate on March 3, 2015, Algonquin continued to pursue the PIC Process, albeit in a halting and inefficient manner. *Behnke Aff.*, ¶¶ 18 and 20. In his May 15, 2015, email to Liu, Behnke stated Algonquin "would like to bring matters to a conclusion on the LMI/GOL, [*i.e.*, grant of location] agreements so Algonquin will be in a position [sic] complete its proceeding before the Public Improvement Commission." *Id.*, Ex. J; *see also Sullivan Aff.*, ¶ 9.

Plainly, Algonquin understood and believed that a grant of location from PIC would provide the necessary right-of-way under the West Roxbury streets to install the pipeline in accordance with the Certificate. Easements are not, and were never, necessary. Accordingly, Algonquin has not established that it can make out all of the elements under its § 717f(h) eminent domain cause of action.

9

747298.2

Notably, on the issue of the alleged necessity of the easements, Algonquin cites only to paragraph 8 of the Gessner Affidavit, which makes the conclusory assertion that "[t]o complete construction . . . in accordance with the Certificate . . . Algonquin must acquire permanent and temporary easements" on the West Roxbury streets at issue. That is demonstrably incorrect and contradicted by abundant evidence that a grant of location from PIC would provide the necessary right-of-way. *See Behnke Aff.*, ¶¶ 7-8 and Exs. C and K; *Liu Aff.*, ¶¶ 4-16; *Sullivan Aff.*, ¶ 9.

At a minimum, there is a material dispute of fact as to whether Algonquin "must acquire permanent and temporary easements," *Gessner Aff.*, ¶8, given the availability of a grant of location through the PIC Process, *Behnke Aff.*, ¶¶ 7-8; *Liu Aff.*, ¶¶ 4-7.

2. **A genuine dispute as to whether Algonquin negotiated in good faith with PIC and Boston precludes granting partial summary judgment to Algonquin.**

In neither its Amended Complaint nor its Statement Of Undisputed Material Facts does Algonquin allege that it engaged in good faith negotiations with PIC or the City for the acquisition of the easements. In its Memorandum, it argues that it did not have to negotiate in good faith but, if it was required to, it did. *Pl. Memo.*, pp. 11-14. That is a hotly dispute question of fact.

### A. The federal courts are divided over whether good faith negotiation is a condition precedent to a condemnation action under § 717f(h).

Algonquin points out, correctly, that in *Maritimes & Northeast Pipeline, LLC v. Decoulos*, 146 Fed. App'x 495 (1st Cir. 2005) (per curiam), *cert. denied*, 546 U.S. 1138, 126 S. Ct. 1148 (2006), the First Circuit stated "Absent any credible authority making good faith negotiation a requirement precedent to the condemnation action [under §

747298.2

717f(h)], we decline the invitation to create one in this case." *Id.* at 498 (internal citations omitted).

On this question, however, the "federal courts are divided." *Guardian Pipeline, LLC v. 295.49 Acres of Land*, 2008 WL 1751358 *14 (E.D. Wisc. 2008). Several courts, including the Ninth Circuit, have held that a pipeline company holding a FERC certificate, which seeks to invoke section 717f(h), "must. . . establish that it engaged in good faith negotiations with the landowner." *Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa County*, 550 F.3d 770, 776 (9th Cir. 2008); *quoting Nat'l Fuel Gas Supply Corp. v. 138 Acres of Land*, 84 F. Supp. 2d 405, 416 (W.D.N.Y. 2000); *accord Guardian Pipeline LLC v. 529.42 Acres of Land*, 210 F. Supp. 2d 971, 973 (N.D. Ill. 2002) (noting the "judicial gloss that the holder must engage in good faith negotiations with the landowner before it can invoke the power of eminent domain"); *USG Pipeline, Co. v. 1.74 Acres in Marion County*, 1 F. Supp. 2d 816, 822 (E.D. Tenn. 1998) ("Courts also have imposed a requirement that the holder of the FERC Certificate negotiate in good faith with the owners to acquire the property."); *Transcontinental Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990) ("federal law requires the condemner to have conducted good faith negotiations with the landowner in order to acquire the property").

Most recently, in *Alliance Pipeline L.P. v. 4.360 Acres of Land*, 746 F.3d 362 (8th Cir.), *cert. denied.* ___ U.S. ___, 135 S. Ct. 245 (2014), the Eight Circuit noted that federal courts "are split as to whether § 717f(h) contains an implied requirement of good-faith negotiation" and avoided resolving that question by concluding that the gas pipeline condemnor before it had "satisfied any duty to negotiate . . . in good faith." *Id.* at 367

11

747298.2

and 368. Whether a plaintiff pursuing a condemnation action under § 717f(h) must prove good faith negotiations is not a matter of settled law.

### B. The Court should rule that Algonquin must establish that it negotiated in good faith with the City and PIC.

The City and PIC readily concede that when the First Circuit had the chance to impose a good faith negotiation requirement on a pipeline company pursuing a § 717f(h) condemnation action, it declined to do so. *Maritimes*, 146 Fed. App'x at 998. But the First Circuit decision in *Maritimes* can be fairly read, and should be read, to mean that in *that* particular case, it was not prepared to decide which side of the divided federal courts it was on. It hastened to clarify that by declining the invitation to find good faith negotiation to be a condition precedent, it did "not imply that the negotiations at issue here were not in good faith." *Id.* Unlike the take it or leave it offer with a seven day deadline approach of Algonquin, the certificate holding pipeline company in *Maritimes* engaged in several months of negotiations and discussions on several occasions with the private landowner. *Id.* at 496-97. After those several months of negotiations to purchase the easement rights, the pipeline company made an offer that was two and half times greater than the appraised value of the easement. *Id.* Only when the land owner rejected that offer was the § 717f(h) action commenced. *Id.* That was not a factual context that required the First Circuit to address the questions dividing the federal courts and presented here. As discussed, in Section 2C, *infra,* Algonquin did not engage in anything that could be called good faith negotiation with PIC and the City.

Section 717f(h) contains an obvious, if implicit, obligation on the part of a holder of a certificate to engage with the owner of the property and to seek an agreement as to the compensation to be paid for the necessary right-of-way. The statute does not permit

12

747298.2

the certificate holder to simply run into court and demand condemnation. *Id.* Being "unable to agree with the owner of the property to the compensation," is a prerequisite to suit. *Id.* Algonquin's concedes as much. *Pl. Memo,* pp. 8 and 13.

Algonquin's unstated, but inescapable, theory is that that statutory prerequisite can be satisfied by a bad faith or sham offer. Algonquin's interpretation of the statue, is that if it had offered PIC one dollar and gave it four hours to respond that "offer" would have met the requirements of the statute. Surely, Congress did not intend that, when it crafted this statute requiring Algonquin to attempt to agree with the property owner on the compensation to be paid. Statutes are to be "construed in a commonsense manner" and "avoiding absurd or counter-intuitive results." *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir.), *cert. denied*, 520 U.S. 1258, 117 S. Ct. 2424 (1997), *citing O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996) and *Sullivan v. CIA*, 992 F.2d 1249, 1252 (1st Cir. 1993). Algonquin's construction of § 717f(h) defies commonsense and would yield an absurd and counterintuitive result. It should be rejected.

### C. Algonquin did not negotiate in good faith.

#### (1) Algonquin did not even attempt to negotiate in good faith to purchase the easements.

Gessner's own description of Algonquin's "offer" to PIC is telling. He says that through his June 23, 2015 letter, "Algonquin offered to purchase" the easements for $6000,000 and "that if the PIC did not accept Algonquin's offer by June 30, 2015, then Algonquin would file a condemnation action to take the easement rights." *Gessner Aff.*, ¶ 19. That was the first and only communication about easements. Algonquin's "negotiating" strategy was: accept our offer within a week or be sued. *Id.* And, it made good on its threat. That is not good faith negotiation. None of the cases relied upon by

13

Algonquin, where courts found that pipeline companies negotiated in good faith, have facts even close to Algonquin's highly aggressive approach.

In context, the Gessner Letter was more threat than offer. He complains about the PIC Process and promises that "even if Algonquin files a condemnation action" it "will be willing to discuss" an agreement "up until the time" of the hearing on its motion or partial summary judgment. *Gessner Aff.*, Ex. E. In a sense, Algonquin has already unilaterally set a second deadline for PIC and the City to face. *Id.* This "negotiating" approach is not immoral or criminal, but it could not be characterized as in good faith.

Furthermore, the property interests that Algonquin was offering to purchase were permanent and temporary easements. Certainly, good faith negotiation would require Algonquin to articulate clearly the precise easements that it was seeking to buy. It utterly failed to do so. *Liming Aff.*, ¶¶ 4-11. It was not good faith negotiation for Algonquin to make an offer, with a very short deadline and threat of suit, but without adequately describing the very easements it was seeking to purchase. *Id.*[1]

### (2) Algonquin's incomplete participation in the PIC Process was not part of a negotiation for purposes of its § 717f(h) claim.

On the last page of its Memorandum, Algonquin asserts that "[f]rom October, 2014 through June, 2015," it "attempted to acquire the right from PIC to install its pipeline in the West Roxbury Street."

That is irrelevant to the issue of good faith negotiations preliminary to the commencement of a § 717f(h) suit. A condemnation action under the statute ripens when

---

[1] These deficiencies in Alqonquin's description are also present in the proposed Order Of Taking, which if granted would not describe the easements in a decipherable or intelligible manner.

14

the certificate holder "cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid, for the necessary right-of-way . . . ." The PIC process is an approval process that does not require compensation. *Liu Aff.*, ¶¶ 7-16. When Algonquin initiated the PIC Process it was beginning a process that, if successful, would result in a grant of location from the Commission not an easement by contract for which it would pay PIC or the City. *Id.*

Algonquin cannot boot strap its time spent in the preliminary PIC Process as good faith negotiation for the easements its seeks now by a judicial order of taking. And, if it could, it hardly can meet any rational test of good faith. It never filed a Submission with PIC. *Liu Aff.*, ¶ 18. It repeatedly refused to let Liu keep copies of any of its plans. *Id.*, ¶¶ 21-23, 25, 28 and 30(c). And, it never completed the PIC Process, despite repeated encouragement by PIC representatives to do so. *Id.*, ¶¶ 21 and 32 and Ex. B.

### (3) At a minimum, there is a material dispute of fact as to whether Algonquin negotiated in good faith.

Algonquin can argue that a jury might find that it negotiated in good faith. But the dispute of fact over whether it did precludes summary judgment. *E.g., Augat, Inc. v. Collier*, 1996 WL 110076, *34 (D. Mass. Feb. 8, 1996) (denying summary judgment on the issue of whether party breached its obligation to negotiate in good faith).

### 3. Algonquin must obtain its rights-of-way through the PIC Process.

Because Algonquin filed and served its motion for partial summary judgment with its original complaint and subsequently filed its Amended Complaint, the City and PIC will oppose the motion before they file their answer.

When the City and PIC file their answer to the Amended Complaint, they will, pursuant to Fed. R. Civ. P. 71.1(e)(2), state all for their objections and defenses. One of

15

the defenses that the City and PIC will assert is that Algonquin is required to obtain its right-of-way license through the PIC Process. As Algonquin's counsel states in his Affidavit, "Under [City] Ordinances Chapter 11, § 6.14, the PIC must authorize the issuance of a permit for the purposes of laying pipes under the public streets of Boston." *Behnke Aff.*, ¶ 7. The City and PIC agree. *See Liu Aff.*, ¶¶ 4-5. And because the PIC Process is not pre-empted by the NGA and is not inconsistent, or in conflict with, either the NGA or the Certificate, Algonquin must seek its subsurface right-of-way through that process.

        **A.**     **Under the Supreme Court's recent decision in *Oneok*, the PIC Process is not pre-empted by the NGA.**

On April 21, 2015, the Supreme Court issued its decision in *Oneok, Inc. v. Learjet, Inc.*, ___ U.S. ___, 135 S. Ct. 1591 (2015), concerning federal pre-emption under the NGA. In *Oneok,* the Court held that state law antitrust claims against natural gas pipeline companies did not fall within the field of matters pre-empted by the NGA, even though the claims challenged industry practices bearing on the setting of wholesale natural gas rates, which is matter recognized as squarely within the exclusive jurisdictional scope of the act. As Justice Scalia's dissent makes clear, *Oneok* "is an unprecedented decision." *Id.*, ___ U.S. ___, 135 S. Ct. at 1605 (Scalia, J. dissenting). The analysis of federal pre-emption under the NGA was altered by *Oneok*. Any pre-emption attack here by Algonquin would fail under the analysis now required by this controlling case.

The starting point is *Oneok* was the NGA's jurisdictional scope, which includes "the sale in interstate commerce of natural gas for resale for ultimate public consumption . . . and to [the] natural gas companies" engaged in such sales. 15 U.S.C. §

16

717(b). Through this provision, the NGA establishes federal authority to regulate wholesale natural gas sales ("jurisdictional sales") and the interstate pipeline company wholesalers ("jurisdictional sellers"). *Oneok*, ___ U.S. ___, 135 S. Ct. at 1596. It had been generally accepted that, through the NGA, Congress also implicitly occupied the "field," giving the federal government exclusive control over the wholesale natural gas market. *Id.* ___ U.S. ___, 135 S. Ct. at 1594. Significantly, the NGA grants FERC authority to ensure that rates for jurisdictional sales, or practices affecting such rates, are reasonable. *Id.* at 1599; 15 U.S.C. §§ 717(b), 717d(a).

In *Oneok*, large commercial and industrial customers who purchased natural gas directly from pipeline companies in retail transactions brought state antitrust law claims alleging that defendants had acted in concert to manipulate the natural gas indices, inflate retail prices, and overcharge plaintiffs. The defendants removed the actions to federal district court, the district court dismissed the claims as pre-empted by the NGA, because the claims challenged practices directly affecting wholesale jurisdictional rates, not merely retail rates, and, hence, sought to regulate in a federal field. *Oneok*, ___ U.S. ___, 135 S. Ct. at 1598. The Ninth Circuit, however, reversed, emphasizing that the type of transactions at which the state-law claims were aimed (retail sales) were not pre-empted by the NGA, even if the alleged underlying market manipulation raised wholesale rates as well. *Id.* ___ U.S. ___, 135 S. Ct. at 1599.

The Supreme Court affirmed. It emphasized the NGA's legislative history, which showed that Congress "meticulous[ly]" drafted the NGA to preserve state power outside the NGA's jurisdictional scope. *Id.* According to the Court, this warranted judicial caution when making NGA field pre-emption determinations where the state law at issue

747298.2

applies to both non-jurisdictional and jurisdictional transaction-related conduct. *Id.* Examining its prior NGA "field" pre-emption precedents, the Court identified the key determinant to be "the *target* at which the state law *aims*" and described the "proper test for purposes of pre-emption in the natural gas context" to be "whether the challenged [state law] measures are 'aimed directly'" at jurisdictional sellers and sales "or not." *Oneok*, ___ U.S. ___, 135 S. Ct. at 1600 and 1601.

In applying this test, the Court observed that the states aimed their antitrust laws not at pipeline companies but at businesses generally. *Oneok*, ___ U.S. ___, 135 S. Ct. at 1601. The Court also noted that the plaintiffs' claims were directed at practices affecting non-jurisdictional retail rates, the cause of their alleged injury. Moreover, these lawsuits did not challenge the reasonableness of any wholesale rates, just "background marketplace conditions" affecting both wholesale and retail rates. *Oneok*, ___ U.S. ___, 135 S. Ct. at 1602. It held, therefore, that the NGA did not preempt plaintiffs' state law claims.

Here, the PIC Process is "not aimed at natural-gas companies, in particular, but rather all businesses in the market place," which have a need for subsurface access to the City's public ways. *See Oneok*, ___ U.S. ___,135 S. Ct. at 1601. Thus, under *Oneok*, any federal pre-emption challenge to the PIC Process should fail as a matter of "field" pre-emption.

Nowhere in its Amended Complaint does Algonquin claim that the PIC Process is pre-empted by the NGA. Similarly, the Amended Complaint is devoid of any allegations that compliance with both the PIC Process and the NGA is impossible or that the PIC Process stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress. *See Oneok*, ___ U.S. ___, 135 S. Ct. at 1596 (discussing "conflict pre-emption").

      **B.    The Amended Complaint does not allege, and Algonquin has neither shown nor argued, that the PIC Process in inconsistent, or in conflict, with the NGA or the Certificate.**

The Amended Complaint does not allege that the PIC Process is inconsistent, or in conflict with, either the NGA or Algonquin's Certificate. There is no legal basis for Algonquin to fail to complete the PIC Process it started but has failed to complete.

## CONCLUSION

The City of Boston and PIC have a vital interest in participating fully in the planning and coordination of subsurface installations under the streets of the city. They have a process that permits private parties to obtain access to those public ways. Algonquin availed itself to that process and thereby conceded that the easements it now demands are not necessary. And, in its haste to lay the ground work for this suit, it made a threat masquerading as an "offer," but never engaged in good faith negotiations as it was required. Those two deficiencies are fatal to both its case and the present motion.

The Court should deny Algonquin's motion for partial summary judgment. And Algonquin should return to the grant of location process that it is required to follow.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), defendants respectfully request a hearing on plaintiff's motion for partial summary judgment.

                Defendants,

                **THE CITY OF BOSTON and THE BOSTON PUBLIC IMPROVEMENT COMMISSION,**

                /s/ Thomas S. Fitzpatrick
                Thomas S. Fitzpatrick  (BBO No.556453)
                Davis, Malm & D'Agostine, P.C.
                One Boston Place
                Boston, MA  02108
                (617) 589-3865
Dated: July 22, 2015        tfizpatrick@davismalm.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 22, 2015 and served by mail on anyone unable to accept electronic filing.

                /s/ Thomas S. Fitzpatrick
                Thomas S. Fitzpatrick

747298.2