UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALGONQUIN GAS TRANSMISSION, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>APPROXIMATELY 161,949 CUBIC FEET and APPROXIMATELY 8,248 LINEAR FEET OF PERMANENT EASEMENT AREA, and APPROXIMATELY 482,291 SQUARE FEET OF TEMPORARY EASEMENT AREA IN THE CITY OF BOSTON, MASSACHUSETTS, THE BOSTON PUBLIC IMPROVEMENT COMMISSION, and THE CITY OF BOSTON, MASSACHUSETTS,<br><br>*Defendants.* | No. 15-CV-12870-WGY |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AUTHORIZING IMMEDIATE POSSESSION**

**INTRODUCTION**

This is an action brought under Section 7(h) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), in which Algonquin Gas Transmission, LLC seeks an order granting it permanent and temporary easements over and under three streets spanning one and a half miles in the West Roxbury neighborhood of the City of Boston.

After pursuing a grant of location license for subsurface access under those streets from the Boston Public Improvement Commission ("PIC"), Algonquin abandoned the "PIC Process"[1] and sued the defendants. With its original Complaint, Algonquin filed a motion for partial summary judgment seeking to confirm its alleged right to take the easements by eminent domain. That motion for partial summary judgment is opposed by the City and PIC and scheduled for oral argument on September 22, 2015.

---

[1] The "PIC Process" is described in the Affidavit Of Chong Liu [Document 22], ¶¶ 6-16 and Ex. A.

More recently, Algonquin was roused from its dream of acquiring "quick-take" possession of the City's streets by a mere interlocutory partial summary judgment decision. It now moves for a preliminary injunction granting it immediate access to those streets, under which it would install a gas pipeline. But, it has utterly failed to satisfy any of the four requirements for such relief.

## ARGUMENT

1. **Algonquin has failed to meet its burden of establishing an entitlement to the extraordinary and drastic remedy of a preliminary injunction.**

A preliminary injunction "is an 'extraordinary and drastic remedy.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *quoting Munaf v. Geren*, 553 U.S. 674, 689-90, 128 S. Ct. 2207, 2219 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2948, at 129 (2d ed. 1995)). Such an order "is never awarded as of right." *Voice of the Arab World*, 645 F.3d at 32; *quoting Munaf*, 553 U.S. at 690, 128 S. Ct. at 2219.

The party seeking a preliminary injunction "must establish" four things: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Voice of the Arab World*, 645 F.3d at 32; *quoting Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). As the party seeking a preliminary injunction, Algonquin bears the burdens of establishing these four prerequisites to injunctive relief. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

These principles apply in a case such as this one, where a gas company in a

§ 717f(h) suit seeks a preliminary injunction granting it immediate possession of the landowner's property. To obtain that "relief, the gas company must satisfy the strict requirements for a preliminary injunction." *E. Tenn. Natural Gas Co. v. Sage*, 361 F.2d. 808, 825 (4th Cir. 2004). Algonquin has satisfied none of them.

### A.  Algonquin has not, and cannot, establish that it is likely to succeed on the merits of its Section 717f(h) action.

Algonquin claims that it is "certain to succeed on the merits of its condemnation claim." *Memo.* p. 4. It rests on its Memorandum In Support Of Motion For Partial Summary Judgment [Document 9]. *Id.* Its overconfidence ignores a fatal gap in its prima facie case.

All parties agree that in order to make its case under § 717f(h), Algonquin must prove that the easements over and under the West Roxbury Streets are "necessary" to comply with the Certificate of Public Necessity and Convenience ("Certificate") issued by the Federal Energy Regulatory Commission ("FERC"). *Id.* p. 7; *see also* 15 U.S.C. § 717f(h) (right to condemnation limited to only a "necessary right-of-way").

It is now beyond any legitimate dispute that the easements are not necessary. As the first James Behnke Affidavit [Document 10] explains, PIC has a well established process for "the issuance of a permit for the purpose of laying pipes under the public streets of Boston." *Id.*, ¶ 7. Through this process, a party such as Algonquin "can obtain a Grant of Location for access to and use of the Boston streets for their facilities." *Id.*

Algonquin has repeatedly and consistently acknowledged that a grant of location license from PIC would provide Algonquin with the necessary access to install its

pipeline along the route it selected and which was subsequently approved by FERC.[2] *See Behnke Aff.*, ¶¶ 8-12, 15, and 18 and Exs. C and J; *see also Liu Aff.*, ¶¶ 18-25. For example, in his January 9, 2015 email to PIC counsel, Chong Liu, Behnke stated that "Algonquin currently expects to apply to the Commission to be heard at a public hearing . . . in February of 2015." *Behnke Aff.*, Ex. C.

Even after FERC issued the Certificate on March 3, 2015, Algonquin continued to pursue the PIC Process. *Behnke Aff.*, ¶ 18 and Ex. J. In his May 15, 2015, email to Liu, Behnke stated Algonquin "would like to bring matters to a conclusion on the LMI/GOL, [*i.e.*, grant of location] agreements so Algonquin will be in a position [sic] complete its proceeding before the Public Improvement Commission." *Id.*, Ex. J. Algonquin's unambiguous conduct in pursuant of a grant of location license from PIC is proof that the easements it now demands are not "necessary" under § 717f(h).

And Algonquin's words now confirm its conduct. In its Reply [Document 32], Algonquin explained that it pursued the PIC Process because that process rendered "unnecessary" a condemnation action to acquire easements. *Reply*, p. 15. In short, Algonquin now admits what it has always understood and believed, *i.e.*, that a grant of location from PIC would provide the necessary access under the West Roxbury streets to install its pipeline in accordance with the Certificate and that easements are not, and never were, necessary.

Accordingly, Algonquin cannot establish all of the elements under its § 717f(h) eminent domain cause of action. As a consequence, Algonquin has not demonstrated that it is likely to succeed on the merits of its sole claim and is not entitled to a preliminary

---

[2] As discussed in Section 1C(3), *infra,* at pp. 14-16, that route is not yet finalized and subject to revision by FERC.

injunction.[3] Because it is unable to establish a likelihood of success, the remaining three factors of the four-part inquiry "become matters of idle curiosity." *Monroig-Zayas*, 445 F.3d at 18; *quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F. 3d 1, 9 (1st Cir. 2002). Yet, when one considers each of those factors, the inexorable conclusion is that Algonquin has not met its burden as to any of them.

### B. Algonquin has not established that it is likely to suffer irreparable harm in the absence of injunctive relief.

The burden of demonstrating that the absence of the requested preliminary injunction is "likely to cause irreparable harm rests squarely" on Algonquin. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.* Thus, it is axiomatic that a "preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991); *Biogen Idec MA Inc. v. Trustees of Columbia University*, 332 F. Supp. 2d 286, 296, 299-301 (D. Mass. 2004).

As the Supreme Court made clear in *Winter v. Natural Resources Defense Council, Inc.*, the moving party must demonstrate "that irreparable harm is *likely* in the absence of an injunction." 555 U.S. at 22, 129 S. Ct. at 375. (emphasis in original) This standard means that a court may not issue a "preliminary injunction based only on a

---

[3] Algonquin's failure to negotiate in good faith with the City and PIC for a purchase of the unnecessary easements is an additional, independent ground for rejecting Algonquin's claim, its motion for partial summary judgment, and its motion for a preliminary injunction. *See Defendants' Opposition To Plaintiff's Motion For Partial Summary Judgment* [Document 20], pp. 10-15.

possibility of irreparable harm." *Id.* Yet, here, Algonquin's attempt to prove irreparable harm is completely uninformed by that required standard.

The entirety of Algonquin's presentation on the issue of its irreparable harm is contained in paragraphs 10 through 16 of the first Affidavit of David Neal [Document 27, Ex. A]. Upon examination, the assertions set forth in those slim paragraphs fall well short of establishing that it is "likely" that Algonquin will suffer irreparable harm. Indeed, there is no attempt in the affidavit to establish that anything is "likely" to occur. Instead, the Court is treated to a quilt of mere possibilities and luke warm predictions about what "could" happen. *Neal Aff.*, ¶¶ 12-16. Notably, the word "could" appears five times in this portion of the affidavit, which is only a page and a half long. *Id.*

### (1) Algonquin's misinformation about its construction schedule.

Algonquin stumbles out of the batter's box by starting with a lot of misinformation about its construction schedule. On July 30, 2015, Algonquin filed its Weekly Report No. 8,[4] which included its construction schedule for the West Roxbury Lateral. *Affidavit of Thomas S. Fitzpatrick In Opposition To Plaintiff's Motion For a Preliminary Injunction ("Fitz. Aff.")*, Ex. A. That schedule states that construction on Washington Street in West Roxbury will not start until May 21, 2016. *Id.*

On August 3, 2015, Algonquin filed the first Neal Affidavit, upon which it bases its claim of irreparable harm. A central assertion in that affidavit is that Algonquin "currently expects to begin construction on Washington Street in West Roxbury on

---

[4] As a condition of the Certificate, FERC requires Algonquin to file weekly reports, which must include detailed construction schedules for the West Roxbury Lateral. *Affidavit Of Franklin S. Gessner* [Document 11], Ex. A, pp. 60 and 64.

September 21, 2015." *Neal Aff.*, ¶ 10. That assertion was a misrepresentation, which Algonquin and Neal have clumsily attempted to walk back and obfuscate.

Four days after filing the Neal Affidavit, Algonquin filed its Weekly Report No. 10, dated August 7, 2015, which included a new construction schedule for the West Roxbury Lateral. *Fitz. Aff.*, Ex. B.[5] It states that the start of construction on Washington Street in West Roxbury had been pushed out to June 3, 2016, *id.*, Ex. B, nearly eight months after the date that Neal told the Court that work was to start.

When Algonquin's misrepresentation was exposed, Neal backed off of his assertion that work on Washington Street would start in September 2015. *Second Affidavit of David Neal* [Document 38], ¶ 6. He now says that "Algonquin anticipates that construction will start on Washington Street and/or Grove Street in West Roxbury on September 21, 2015." *Id.*

He also claimed that a new construction schedule "will be attached to the next Weekly Report to be filed with FERC." *Id.* That too turned out to be untrue. On August 20, 2015, Algonquin filed its next Weekly Report No. 11, which included no construction schedule. *Fitz. Aff.*, Ex. C.

Its Weekly Report No. 12, however, did include a new construction schedule, which states the work on Washington Street is "[a]nticipated" to start "September, 2015." *Id.*, Ex. D. Algonquin is obviously manipulating the "[a]nticipated" start date to conjure the illusion of irreparable harm. The evidence of this is abundant. For example, in its Weekly Reports Nos. 8 and 10, Algonquin consistently stated that the duration of the

---

[5] The construction schedules are *the last page* of each of the Weekly Reports that include such a schedule.

7

750839.1

work on Washington Street, West Roxbury would be two months.[6] Now, after it moved for a preliminary injunction, Algonquin's "[a]nticipated" start and finish dates are "September, 2015" and "Quarter 2, 2016." After accounting fully for the Winter period, during which construction will be suspended, the construction time frame has expanded to five months. Certainly, Algonquin does not need five months to perform two months of work. And given that the work is not planned to be completed until the second quarter of next year, that three month period from April to June of 2016, is more than sufficient for Algonquin to complete all of the work on Washington Street next year and meet its own deadline.

As to Grove Street, all of the published construction schedules indicate that Algonquin's construction activity on that street is scheduled to start in 2015. However, that work will require only two months to complete. *Id.*, Ex. B. There is no reason to think, and no claim by Algonquin, that it cannot be performed in 2016.

    **(2)**     **Algonquin's vague, incomplete, hearsay statements about its construction related contracts do not establish irreparable harm.**

The Neal Affidavit references a construction "contract" with Bond Brothers, Inc. ("Bond") and "contracts with land services companies" to provide right-of-way agents. *Id.*, ¶¶ 11 and 13. It also reports that construction inspectors have been engaged "to be present daily on West Roxbury Lateral construction sites." *Id.*, ¶ 12.

---

[6] In Weekly Report No. 8 the construction period is stated as May 21, 2016 to July 25, 2016. *Fitz. Aff.*, Ex. A. In Weekly Report No. 10, it as June 3, 2016 to August 6, 2016. *Id.*, Ex. B.

8

Immediately upon receipt of the Motion For Preliminary Injunction, defendants' counsel made a written request to Algonquin's for copies of those contracts.[7] Because defendants were obliged to respond to the motion within fourteen days and because none of the parties had yet made their initial disclosures or had their Fed. R. Civ. P. 26(f) conference, that written request was informal in nature. Algonquin had no legal or formal obligation to provide any documents at this time. However, as the moving party, it had an interest in supporting the assertions it made via Neal's hearsay testimony.

On August 25, 2015, Algonquin's counsel responded via a letter together with ten selected pages of material, all relating to the contract with Bond. *Fitz. Aff.*, ¶ 11 and Ex. I. Algonquin refused to provide any of the other requested contracts. *Id.*

Assuming, only for the moment, that paragraph 11 of the Neal Affidavit together with Algonquin's counsel's letter and tiny selection of ten pages of documents established that Algonquin will incur delay costs under its contract with Bond, that is not irreparable harm. A party seeking a preliminary injunction "does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Potts NH RE, LLC v. Northgate Classics, LLC*, 2012 WL 1964554 *10 (D. N.H. 2012), *quoting Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) (citing *San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 692 F.2d 814, 818 (1st Cir. 1982)); *accord Do Corp. v. Town of Stoughton*, 2013 WL 6383035 *8 (D. Mass. 2013); *Dunkin'*

---

[7] Defendants' counsel's August 18, 2015 letter to Algonquin's counsel, *see Fitz. Aff.*, ¶ 10 and Ex. H, requested the following contracts referenced in the first Neal Affidavit: (1) the contract with Bond referenced in paragraph 11; (2) the contracts with the Construction Inspectors referenced in paragraph 12; (3) the contracts with the land services companies referenced in paragraph 13; and (4) the contract with Boston Gas referenced in paragraph 14.

*Donuts Franchised Restaurants, LLC v. ABM Donuts, Inc.*, 2011 WL 6026129 *7 (D. R.I. 2011) and cases cited.

When a preliminary injunction movant is claiming harm from "a situation brought about by" the movant, that is a "self-inflicted" harm that does not constitute irreparable harm. *Fiba Leasing,* 826 F. Supp. at 39; *accord Do Corp.*, 2013 WL 6383035 *8. Alleged harm, such as the alleged harm claimed here by Algonquin, that "results from the express terms of a contract it negotiated," is "self-inflicted" and not worthy of consideration as irreparable harm. *Salt Lake Tribune Publishing Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). If Algonquin has improvidently bound itself to pay delay charges to Bond (or anyone else), that is a situation of its own making with consequences that do not equate to irreparable harm.

However, there is no basis upon which to find that it is likely any such delay charges will ever be incurred or paid. Paragraph 11 of the Neal Affidavit states:

> Algonquin has entered into a contract with Bond Brothers, Inc. ("Bond") to construct the West Roxbury Lateral. In the event that Bond's construction crews are unable to install the pipe anywhere in West Roxbury, the financial impact on Algonquin will be severe. For each day construction does not occur in West Roxbury, Algonquin will incur delay charges that will range between $60,000 to $130,000 per day, or approximately $3 million per month, assuming a six-day work week. The amount of the delay charges will largely depend on whether construction can alternatively proceed in Westwood or Dedham and the number of crews that can be mobilized.

Those four sentences, unsupported by a copy of the Bond contract, tell the Court very little that is concrete. It is entirely unclear *when* any delay charges would actually be incurred. And, any charges are "largely" dependent on Bond's work in Westwood and Dedham. *Id.* Every construction schedule published by Algonquin has stated that significant components of the West Roxbury Lateral work in both Westwood and

Dedham will stretch into 2016. *Fitz. Aff.*, Exs. A, B, and D. The construction schedule published August 7, 2015 (which is the last credible one) states that such work will continue in Westwood until August 26, 2016 and in Dedham until October 8, 2016. *Id.*, Ex. B. So, based on Algonquin's own statements, it appears likely that no delay charges will ever be incurred. Of course, without the actual Bond contract, one would not know with any certainty. That is why defendants' counsel requested a copy from Algonquin.

Rather than providing the whole contract, Algonquin cherry picked ten pages of materials. *Fitz. Aff.*, Ex. I. Those ten pages *relate* to the Bond contract but they are not all pages *from* the contract. Here is what is included: pages 31 to 33 of what is clearly a long contract (AGT-002 to 004), then a couple of pages of what may be from the same contract (AGT-005 to 006), then three pages from Bond's bid (AGT-007 to 009), and finally a document recently created by Bond at Algonquin's request for purposes of this motion (AGT-010). *Id.*

Algonquin's counsel's letter references various paragraph and passages in these pages. Even if credited as sworn testimony (which it is not), the letter and the selection of pages it discusses fail to establish that it is "likely" that Algonquin will incur any delay charges. None of the documents nor the letter refer to any dates. The definition of the "Work" is not provided. The project schedule is not provided or discussed. Only part of a likely applicable provision concerning "Changes Caused by Events of Force Majeure" is provided (AGT-004). And, the "Change Directive" process includes a dispute resolution process (AGT-002 to AGT-003) governed by Article XVI of the contract, but that has not been provided.

750839.1

The three pages from the bid (AGT-007 to AGT-009) are irrelevant. No evidence has been presented that the bid became part of the contract. Even if it did, Algonquin has grossly overstated the import of Exclusion 17 in the bid, which does not contractually bind Algonquin to keep Bond busy for six ten hour shifts a week.

Admittedly, it was Algonquin's prerogative to refuse to provide the whole Bond contract, but by sharing only a small fraction of that contract, it has confirmed that it cannot establish that delay charges from Bond are "likely" to be paid, in the event an injunction does not issue.

> (3) **Algonquin's concerns about possible events, *after* November 1, 2016, do not constitute immediate irreparable harm and, thus, do not support its request for injunctive relief.**

In a last ditch effort to conjure the illusion of irreparable harm, Neal worries about "lost revenue" and the "reliability" of gas delivery by retailers, *after* November 2016. *Neal Aff.*, ¶¶ 14 and 16. The Neal Affidavit, however, does not establish, or even suggest, that Neal is competent to testify about such matters. He is a project manager "involved with the implementation and planning for construction of pipelines facilities." *Id.*, ¶2. His affidavit lays no foundation for any personal knowledge about Algonquin's finances or the ability of other companies - that he does not work for - to make reliable gas deliveries more than a year from now. Notably, Algonquin refused to furnish a copy of the Boston Gas contract that Neal discusses. *Fitz. Aff.*, Ex. I.

In addition to lacking any foundation, his assertions concerning events that "could" happen are irrelevant. The threat of irreparable harm "must be real and 'immediate.'" *Biogen Idec MA*, 332 F. Supp. 2d at 296, *quoting Fundicao Tupy S.A. v. United States*, 841 F.2d 1101, 1102–03 (Fed. Cir. 1988); *Auto. Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 116 (1st Cir. 1968); *accord Campbell Soup Co. v. ConAgra,*

12

*Inc.* 977 F. 2d 86, 91 (3d Cir. 1992). Threats of possible events that "could" happen over a year from now are neither "real" nor "immediate."

The few irreparable harm cases relied upon by Algonquin are inapposite. Each involved gas pipelines companies that made far more robust and specific demonstrations of likely, real, and immediate harm. For example, in *Sage*, the court found that without a preliminary injunction, the pipeline company would not "meet FERC's deadline" for putting the pipeline in operation, and "would be forced to breach" contracts with "several electric generation plants and local gas utilities." 361 F.3d at 829. Algonquin's threadbare showing pales in comparison.

### C. The balance of the equities tips in favor of denying injunctive relief.

If the requested injunction is granted, the City and PIC will suffer irreparable harm in three distinct ways.

> **(1) The City and PIC have a valid interest in controlling subsurface access to the City's streets that will be permanently impaired, if the injunction is granted.**

The City has a responsibility to oversee activities on and under its public ways. It has a concomitant interest in compliance with the policies and administrative procedures through which it and PIC oversee such activities. *Liu Aff.*, ¶ 8. A critical component of those policies and procedures is the PIC Process. *Id.*, ¶¶ 4-8. If the Court permits Algonquin to avoid participation in, and compliance with, the PIC Process by virtue of a preliminary injunction, the City and PIC's valid interests will be permanently and irrevocably impaired.

> **(2) Immediate possession by Algonquin poses serious risks for the City and its residents.**

The PIC Process is not a pointless bureaucratic, torture chamber. It is a well-established process that is meant to ensure a sensible, coordinated installation. *Id.* Under the three streets at issue, there are already existing water, sewer, storm drain, electric, gas, telephone, traffic signal, lines, utilities and facilities. *Affidavit of John P. Sullivan* [Document 24], ¶¶ 3 and 6-8. The PIC Process is intended to account for that reality. Accordingly, the Boston Water and Sewer Commission ("BWSC") and PIC require that all public and private utilities submit plans for new installations to the BWSC for review and approval prior to installation. *Id.*, ¶ 10.

The BWSC must be aware of any utility installation that will impact its water, sewer and storm drain lines, as well as the water and sewer lines belonging to individual property owners. *Id.* Coordination is essential to avoid serious and irreparable damage to the BWSC's systems, the facilities of other utilities, and the sewer and drain systems of property owners. *Id.* Without that coordination with BWSC and PIC of a subsurface installation, there is a high risk of disastrous consequences, including sewage backing up into homes and flooding of residences and businesses. *Id.* A direct consequence of Algonquin being granted immediate possession will be that the citizens and businesses of West Roxbury will be exposed to that high risk.[8]

> **(3) The route of the West Roxbury Lateral through the City is subject to change by FERC, and the City will be left with incalculable damage, if Algonquin is permitted to tear up the City's streets, before the route is finalized.**

On April 2, 2015, the "City of Boston Delegation," comprised of eight elected official representing the citizens of the City, filed its Request For Rehearing of the FERC

---

[8] Defendants' counsel had videos of the route down the three West Roxbury streets made and uploaded to YouTube.com. *Affidavit of Richard Natale, Jr.*, ¶¶ 2-4. A CD containing one of those videos is also provided as Exhibit J to the Fitzpatrick Affidavit.

14

750839.1

Certificate. *See Reply* [Document 32], Ex. B. One of the issues raised by the delegation was FERC's rejection of an alternative to the approved route down Washington, Grove and Centre Streets. *Id.*, pp. 18-22. Through its Request For Rehearing the delegation asked FERC to reconsider the alternative route, which is substantially preferable to the route on which Algonquin now seek easements and immediate possession. *Id.*

Several other intervenors also filed requests for rehearing, some of which also sought reconsideration of the route of the West Roxbury Lateral. *Fitz. Aff.*, Ex. F. In response, on May 1, 2015, FERC issued an Order Granting Rehearing For Further Consideration, which granted rehearing for the limited purpose of affording FERC more time to consider all the matters raised by the multiple requests for rehearing. *Id.*

However, FERC also proceeded to grant Algonquin several notices to proceed with limited and specific construction activities, including a partial notice to proceed with construction activity on the West Roxbury Lateral in Westwood and Dedham. This caused concern in many quarters.

Among others, United States Congressman Stephen Lynch, a member of the City of Boston Delegation, noted the incongruity of the developing situation. *Fitz. Aff.*, Ex. E. In response to Congressman Lynch's concerns, FERC published a letter to him dated July 10, 2015, which promised all interested parties that it was "carefully reviewing all arguments raised on rehearing and intended to issue an order addressing those arguments in a timely manner." *Id.*, Ex. F.

On the issue of Algonquin's construction activity, FERC made these clarifying points:

> As you note, some construction has been authorized, including project
> facilities in Connecticut, Rhode Island, and Massachusetts. While

> rehearing is pending, the construction activities being performed are at Algonquin's own risk. The commencement of construction has no impact on the Commission's consideration of the individual issues raised for rehearing.

*Id.* Thus, while FERC may continue to authorize construction activities by Algonquin, the final route is not yet finally resolved and FERC has reserved the right to change it.

In the event that that happens, after an injunction for immediate possession, the City will be left with torn up streets, disrupted, and compromised subsurface facilities, and a gas pipeline down a substantial length of the West Roxbury streets that will have to be uninstalled. FERC is not going to uninstall it. Algonquin has neither made any assurances to do so nor provided the financial security to back up such an assurance, (if it is ever given). The burden of dealing with that situation will fall, in the first instance, to the City and PIC. The risk of that is irreparable harm to the City and PIC and to impose that risk in these circumstances is inequitable. The balance of the equities tip in favor of denying Algonquin an injunction.

### D. The requested injunction is not in the public interest.

The injunctive relief sought by Algonquin is not in the public interest for all of the reason stated in the forgoing Section 1C, *supra*, pp. 13-16.

## 2. Algonquin's waiver argument is pointless and ignores bedrock legal principles.

In their Opposition [Document 34] to Algonquin's motion to change the hearing date for the motion for partial summary judgment, the defendants pointed out that the NGA "contains no provision for quick-take or immediate possession." *Sage*, 361 F.3d at 822; *accord Transwestern Pipeline Co., LLC v. 17.19 Acres of Property Located In Maricopa County*, 550 F.3d 770, 774 (9th Cir. 2008) ("All courts examining the issue have agreed that the NGA does not authorize quick-take power.").

16

750839.1

As a consequence, the only way a gas company may lawfully obtain immediate possession of a landowner's land is through an appropriately supported, and ultimately successful, motion for a preliminary injunction under Fed. R. Civ. P. 65. *E.g.*, *Sage*, 361 F.3d at 820; *see also* Jim Behnke & Harold Dondis, *The Sage Approach To Immediate Entry By Private Entities Exercising Federal Eminent Domain Authority Under The National Gas Act And The Federal Power Act*, 27 Energy L. J. 499, 502 (2006).[9] Defendants pointed this out.

Lastly, defendants also pointed out that as a matter of procedural law, a "partial summary judgment order is not a final judgment but is merely a pretrial adjudication that certain issues are established for trial." *Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 37 n.4 (1st Cir. 2007); *quoting Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 6 n.5 (1st Cir. 2004). And, since a partial summary judgment decision, by its very nature, "adjudicates fewer than all the claims or the rights and liabilities of fewer than all of the parties," it "does not end the action as to *any of the claims.*" Fed. R. Civ. P. 54(b) (emphasis added). So, even if Algonquin obtains a partial summary judgment decision, it would not entitle Algonquin to take immediate possession of the City's streets.

Algonquin makes note of these arguments by the City and PIC but then asserts that "an argument not made in opposition to a motion for partial summary judgment is deemed waived." *Memo*, p. 2. But, these arguments are not made *in opposition* to

---

[9] In their *Energy Law Journal* article, Algonquin's counsel acknowledged that a FERC certificate holder seeking immediate possession in a NGA condemnation action must establish an entitlement to a mandatory preliminary injunction. *Id.* A link to the article may be found at Mr. Behnke's biography at www.richmaylaw.com/?t=3&A=5085&format=XML&p=5324.

17

750839.1

Algonquin's motion for partial summary judgment. They are arguments about the nature and limits of any partial summary judgment victory that Algonquin might theoretically achieve in the future. Under the substantive and procedural law cited above, such a victory would not constitute judicial permission to enter or possess the City's property. Indeed, Algonquin relies extensively on the *Sage* decision of the Fourth Circuit, which so states. That law is unambiguous and uncontestable.

In contrast, when Algonquin baldly claims that "once the pipeline company has taken the easements by acquiring an order of taking by way of partial summary judgment on its authority to condemn, the company has acquired the right to enter the property," it cites to no authority for that proposition. *Id.* Defendants are unaware of any such authority. And, if there were such authority, it would have to be reconciled with the cases cited above, Rule 54(b), and Algonquin's counsel's own article in the *Energy Law Review*. That would likely be an impossible task. But, since Algonquin has now moved for a preliminary injunction, the City and PIC are entitled to offer any and all arguments in opposition thereto. Nothing has been waived.

3.     **The undisputed and significant defects in Algonquin's description of the permanent easements it seeks, preclude the grant of those easements until those deficiencies are cured.**

In their Local Rule 56.1 Statement [Document 21] and through the Affidavit Of Todd M. Liming, PE, [Documents 23], the defendants identified numerous significant deficiencies in Algonquin's description of the permanent and temporary easements that it seeks by condemnation. *Defendants' Local Rule 56.1 Statement,* ¶¶ 30-36; *Liming Aff.,* ¶¶ 3-11.

Algonquin insists that its temporary easements/work spaces are adequately described. But, it does not dispute the deficiencies in the description of its permanent

18

750839.1

easements. *See Plaintiff's Response To Defendants' Local Rule 56.1 Statement* [Document 28], ¶¶ 31-40. Until those deficiencies are cured, the Court should not issue any order granting indecipherable, unintelligible permanent easements.

### 4. Algonquin has not offered adequate security.

Assuming *arguendo* that the Court is inclined to grant the preliminary injunction, Algonquin proposal "to pay into court the amount that" it "offered for the easements," *Algonquin* Memo, p. 7, is wholly inadequate security under Fed. R. Civ. P. 65(c). Under that rule, an injunction may issue "only if" Algonquin "gives security in an amount that the court considers proper to pay" the City and PIC's "costs and damages" incurred, if they are found to be "wrongfully enjoined."

Here, Algonquin plans to excavate a mile and a half of the City's streets and install a pipeline down a route that is subject to change. If FERC changes the route, which it reserves the right to do, the construction on and under the West Roxbury streets would have to be remediated at substantial cost and burden to the City.

According to Algonquin, one day of work on the West Roxbury Lateral in the City costs $79,047.24. *Fitz. Aff.*, Ex. I at AGT-010. Based on the construction schedule in Weekly Report No. 10, dated August 7, 2015, if it is allowed to start work on the West Roxbury streets in September of 2015, it will spend two months working in 2015 (September to November) and five months working in 2016 (April 23, 2016 to September 24, 2016). *Id.*, Ex. B.

Those periods total at least 179 work days.[10] That number of work days multiplied by $79,000 yields construction costs (excluding materials) of $14,141,000. That is a reasonable proxy for the what the costs would be to uninstall the pipeline and

---

[10] Thirty days a month times seven months minus thirty-one Sundays (30 x 7 – 31 = 179).

750839.1

restore the City's streets to their condition before any injunction was granted. If the Court is persuaded to issue a preliminary injunction, the proper amount of security that Algonquin should be required to give is not less than $14 million.

## CONCLUSION

A party coming to this, or any federal, Court requesting a preliminary injunction assumes the formidable burden of satisfying the strict requirements for such relief. Algonquin has failed to meet that burden. The Court should deny its motion for a preliminary injunction.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), defendants respectfully request a hearing on plaintiff's motion for a preliminary injunction.

Defendants,

**THE CITY OF BOSTON and THE BOSTON PUBLIC IMPROVEMENT COMMISSION,**

/s/ Thomas S. Fitzpatrick
Thomas S. Fitzpatrick (BBO No. 556453)
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
(617) 589-3865
tfizpatrick@davismalm.com

Dated: September 1, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 1, 2015 and served by mail on anyone unable to accept electronic filing.

/s/ Thomas S. Fitzpatrick
Thomas S. Fitzpatrick